IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.: 4:10cr29-SPM

FRANK PEGUERO, JR.

    Defendant.
_____/

## ORDER DENYING MOTION TO SUPPRESS

Defendant Frank Peguero, Jr. is charged with possession with intent to distribute more than 5 kilograms of cocaine and conspiracy to do the same. The cocaine was found when Defendant consented to a search of his truck after a traffic stop on I-10 in Madison, County, Florida. Defendant contends that the stop was illegal because the deputy sheriff engaged in racial profiling and did not have probable cause to stop him. Defendant also contends that his consent to search his truck was not voluntary.

The Court heard testimony and arguments on September 20, 2010. The parties submitted written arguments before the hearing (docs. 22 and 23) as well as supplemental written arguments afterward (docs. 27 and 28). Upon consideration of the evidence and the arguments, Defendant's motion to

suppress will be denied.

**Background**

At approximately 1:00 a.m. on March 4, 2010, Madison County Sheriff's Deputy Doug Haskell was parked on the westbound shoulder of I-10 while completing a traffic stop. Deputy Haskell saw Defendant's truck approaching from the eastbound lane, slowing down abruptly as it passed.[1] Shining a flashlight on the truck, Deputy Haskell could see that the truck was maroon and had four doors. Given the darkness, distance, and speed of the passing truck, he could not see how many people were inside or discern the ethnicity of any occupant. He did, however, see that the truck had a Texas tag.

Deputy Haskell turned across the median strip and headed eastbound to follow the truck. When he spotted the truck, Deputy Haskell lagged behind approximately 150 to 200 yards and used his speedometer to pace its speed. At a steady speed of 79 miles an hour, the truck was slowly pulling away from Deputy Haskell.

Deputy Haskell activated his blue lights and the car's recording equipment,

---

[1] Contrary to Defendant's argument, Defendant was not required to slow down under Florida's move over act, which requires vehicles approaching an emergency vehicle to move one lane over or, if on a two lane road, to slow down. § 316.126 (1)(b). Defendant was not traveling on a two lane road. Nor was he traveling in the lane next to where Deputy Haskell was parked. He was traveling on an interstate highway, going in the opposite direction, and separated from Deputy Haskell by two or three lanes of traffic and a thirty-six foot wide median.

which is programmed to save video taken from the car's camera from approximately one minute before the blue lights are activated and video taken thereafter. The video shows Defendant's truck veering off toward an exit, then veering back onto the road, and driving over the edge of the lane once more. When the blue lights came on, Defendant's truck slowed down, then pulled over to the side of the road. The recording shows the conversation that Deputy Haskell had with Defendant and Defendant's wife.

From the time the truck pulled over to the time Defendant consented to a search, approximately ten minutes passed. During this time, Deputy Haskell ran Defendant's driver's license, checked for warrants, retrieved the truck's registration from Defendant's wife, ran the registration, spoke to Defendant about the tires on the truck[2], and spoke with Defendant and his wife about their destination. Deputy Haskell did not issue a speeding ticket to Defendant but instead wrote a written warning. He asked Defendant if Defendant was tired or drinking alcohol and pointed out that Defendant's truck had veered outside the lane while the Deputy was following.[3]

---

[2] Defendant acknowledged that he changed his original tires to a larger size, and had set his cruise control on 70 m.p.h. A taller tire will make the speedometer read below the vehicle's actual speed.

[3] Although Defendant argues that he did not commit a traffic violation by failing to maintain a single lane, it is a moot point. Deputy Haskell stopped Defendant for speeding, not for failure to maintain a single lane. Deputy Haskell mentioned Defendant's movement out of the lane because he was concerned

During their conversation, Defendant told Deputy Haskell that he needed to find a gas station, which surprised Deputy Haskell because Defendant had passed an exit with a gas station less than a mile behind. Deputy Haskell learned from Defendant that Defendant had been driving for ten hours and was traveling from Edinburg, Texas to Frostproof, Florida, to pick up his niece. Defendant's wife identified their destination as Tampa, Florida, which is approximately seventy miles from Frostproof.

Defendant told Deputy Haskell that he was not falling asleep at the wheel and that he had not been drinking. Defendant denied having alcohol in the truck and told Deputy Haskell that he could search the cooler. Deputy Haskell asked Defendant if he had contraband, or weapons, or large amounts of money in his truck, and Defendant stated no. When Deputy Haskell asked Defendant if he had "any problem if I search your truck?", Defendant shook his head and said "no." This occurred at approximately 1:11 a.m. just after Deputy Haskell had written the warning ticket and returned Defendant's license[4] and registration.

Deputy Haskell asked Defendant's wife to exit the truck so he could search. She lost hold of the lap dog she had been holding as she exited and

---

that Defendant was overly tired or otherwise impaired, which is a reasonable concern when a driver crosses back and forth over the lane line.

[4] Defendant did not have his actual driver's license to give to Deputy Haskell. He only had a paper copy of it, which Deputy Haskell returned with the registration when he gave Defendant the warning ticket.

appeared to Deputy Haskell to be nervous. Inside the truck, Deputy Haskell saw air fresheners and noticed that Defendant and his wife had only two small bags, despite the fact that they were on a long trip. He noticed that the truck was unusually clean–even the inside of the fender wells had been wiped down.

Deputy Haskell saw fresh tool marks and hand prints on the gas tank. When tapped, it gave a dull thud rather than a hollow or sloshing sound. In response to Deputy Haskell's inquiry, Defendant denied having any work done to the truck other than new tires. Deputy Haskell called another deputy for help. He then took his trained drug detection dog around the truck and the dog made a positive alert to the gas tank. A density meter Deputy Haskell used to check the tank indicated that a solid substance was inside.

Deputy Haskell asked Defendant if he could take the truck to a nearby garage to check the gas tank. Defendant consented. When the sending unit for the gas gauge was removed, a thirty kilogram package of cocaine was discovered.

**Discussion**

A law enforcement officer may stop a vehicle if he has reasonable suspicion to investigate criminal activity or probable cause to believe that a traffic violation has occurred. United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009). In this case, Deputy Haskell was justified in stopping Defendant's truck because he had probable cause to believe Defendant was speeding.

Defendant's concern that he had been targeted because he fit a drug profile is irrelevant because Deputy Haskell had probable cause to stop Defendant for speeding. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996). Moreover, Deputy Haskell testified that he could not see the occupants of the vehicle. There is no evidence that his decision to stop the truck was based on the occupants' race or ethnicity.

The Court credits as true Deputy Haskell's testimony that he paced Defendant's truck at over 79 miles per hour.[5] Although Defendant argues that Deputy Haskell could not accurately pace a vehicle from more than 100 yards away, the Deputy could at least determine that Defendant's truck was pulling away when he maintained a speed of 79 miles per hour. Deputy Haskell's testimony was corroborated by the testimony of the expert witnesses, including Defendant's experts, all of whom studied the video and determined that

---

[5] Defendant argues against the admission of the pacing evidence because the Government did not provide in its discovery disclosures a copy of the certificates for the speedometer calibration and Deputy Haskell's training. The Government did not violate the discovery rule because the Government did not intend to use the certificates as evidence-in-chief at trial and the certificates were not material to the preparation of the defense. See N.D. Fla. Loc. R. 26.3(B). In any event, there was no purposeful concealment of evidence by the Government and Defendant has suffered no prejudice by not receiving the certificates earlier.

Defendant's truck was traveling over the posted speed limit of 70 miles per hour.[6]

Defendant contends nevertheless that Deputy Haskell did not have probable cause to stop him for speeding because Deputy Haskell decided only to issue a warning. Any speed above the posted limit, however, is a traffic infraction that will justify a traffic stop, and a warning is appropriate when the infraction is for speeding less than five miles above the posted limit. Fla. Stat. § 318.18(3)(b).

Defendant argues that even if the initial stop was lawful, Deputy Haskell unnecessarily extended the time to write the warning and coerced Defendant to consent to the search. A traffic stop "must last no longer than is necessary to effectuate the purpose of the stop." United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (internal citations omitted). A police officer may lengthen the detention for questioning beyond that related to the initial stop in two circumstances: (1) when the officer has an objectively reasonable suspicion that criminal conduct has been or is occurring, and (2) when the initial stop becomes

---

[6] Defense expert Victor DeBrunner estimated Defendant's speed at 72.8 to 73.6 miles per hour. Defense expert Chris Yates estimated Defendant's speed at various points ranging between 72.4 miles per hour and 77.3 miles per hour. The estimates do not contradict the testimony of Deputy Haskell that he paced Defendant's truck at over 79 miles per hour because the pacing occurred before the recording starts. By the time the recording starts, it is likely that Defendant had seen Deputy Haskell because the distance between them had closed considerably. Defendant's serve at the exit suggests that he had slowed and considered turning off.

a consensual encounter. See United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007). Courts look to the totality of the circumstances when determining whether a stop has become consensual.

In this case, the traffic stop conducted by Deputy Haskell was not unreasonably, unusually, or outrageously lengthy, lasting approximately ten minutes when Defendant gave his consent to search the truck. Throughout this time, Deputy Haskell was engaged in administrative matters pertinent to the initial stop, such as checking Defendant's driver's license, checking for outstanding warrants, and waiting for Defendant's wife to produce the vehicle registration.

Once Deputy Haskell gave the warning ticket to Defendant and returned the copy of his license and registration, he asked for consent to search the truck. Deputy Haskell did not prolong the traffic stop to obtain consent and Defendant freely and voluntarily consented to a search of his truck.

The voluntariness of consent is determined by "analyzing all the circumstances of an individual consent . . . , [and by] careful sifting of the unique facts and circumstances of each case. . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 33 (1973). Some factors to consider are whether the defendant was free to leave, the existence of coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse consent, the ability of the defendant to refuse consent, the extent of the defendant's education and

intelligence, and whether the defendant believed that no incriminating evidence would be found. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002).

Consideration of such factors in this case shows that Defendant's consent to search was freely and voluntarily given. First, no coercive police procedures were used. Deputy Haskell did not display his weapon and he spoke in a conversational tone with Defendant. Defendant was not placed under arrest when he gave his consent, he was only issued a speed warning and his licence and registration were returned. See Ramirez, 476 F.3d at 1238-40 (under reasonable innocent person standard, post-citation conversation between officer and defendant deemed consensual when license and registration have been returned).

Second, Defendant cooperated fully during the traffic stop and during the consensual search. Although Deputy Haskell did not expressly advise Defendant that he could refuse consent to search, Defendant has had prior law enforcement encounters, including two speeding tickets issued on January 29, 2010, and prior arrests for driving while impaired, driving without a license, and forgery. Thus he has experience with the criminal justice system and was likely aware of his right to refuse consent.

Defendant argues that the wording used by Deputy Haskell–"Do you have any problems if I search your truck?"–was ambiguous and that it could have been

taken as an implied threat or a confrontational challenge to object to a search of the truck. In tone and context, however, there was nothing coercive about Deputy Haskell's request when viewed objectively or when viewed from Defendant's standpoint.

Defendant is of a mature age (49 years old). He has lived in the United States his entire life and communicates well in English. There is no indication that he suffers from low intelligence or educational deficits that would make it difficult for him to comprehend the request to search. In fact, it is likely that Defendant consented to the search because he believed that no incriminating evidence would be found. The cocaine was particularly well concealed inside the gas tank. Only an experienced, alert, and diligent officer would notice the clues to its hiding place. Upon consideration of the all the circumstances, the Court finds that Defendant's consent to search was freely and voluntarily given.

The subsequent search of the gas tank was supported by Defendant's consent as well as probable cause based on the alert made by the trained drug dog. United States v, Steed, 548 F.3d 961, 974-75 (11th Cir. 2008). Among other factors giving rise to probable case were the marks on the gas tank, the wiping of the fender wells, the air fresheners, the inconsistencies concerning the travel destination, the lack of baggage, the fact that the truck came from a drug source area, and the nervousness of Defendant's wife. All of these circumstances gave rise to probable cause to look inside the gas tank.

CASE NO.: 4:10cr29-SPM

**Conclusion**

Deputy Haskell had probable cause to stop Defendant's truck for speeding. He did so without knowledge or regard to the occupants' race or ethnicity. The traffic stop was no longer than necessary to issue a warning ticket. Thereafter, Defendant freely and voluntarily consented to a search of his truck, which gave rise to probable cause that drugs were concealed in the gas tank. Based on the foregoing, it is

ORDERED AND ADJUDGED: Defendant's Motion to Suppress (doc. 22) is denied.

DONE AND ORDERED this 7th day of October, 2010.

*s/ Stephan P. Mickle*
Stephan P. Mickle
Chief United States District Judge